```
                                 *

UNITED STATES OF AMERICA
                                 *

        v.                           CRIMINAL NO.:  WDQ-14-0447
                                 *

QUADELL POLLINS
                                 *

*    *    *    *    *    *    *    *    *    *    *    *    *
```

### MEMORANDUM OPINION

Quadell Pollins is charged with unlawful possession of a
firearm by a convicted felon in violation of 18 U.S.C. §
922(g)(1). ECF No. 1. Pending are Pollins's motions to
suppress evidence from a search of his vehicle and to suppress
statements. ECF Nos. 42-43. For the following reasons, the
Court will grant Pollins's motion to suppress evidence. Because
all of Pollins's statements flowed from the unlawful search,
they will also be suppressed, rendering Pollins's other motion
moot.

I.    Background

      A.    Alleged Criminal Conduct[1]

      On July 21, 2013, at approximately 1:50 pm, a Baltimore
County 911 operator received a call, reporting that an African
American male driver and Caucasian female passenger had a
handgun in their car at the 7-Eleven convenience store on

---

[1] The facts are from the parties' filings (ECF Nos. 42-43, 55,
60, 63, 68, 70), as well as the testimony provided at the
evidentiary hearing (ECF No. 69).

Holabird Avenue, in Baltimore County, Maryland. ECF No. 55 at 2. The caller refused to identify himself, but described the vehicle as a gold Chrysler with expired North Carolina tags. *Id.* The caller did not tell the operator how he had knowledge of the gun, and indicated that he was not positive about the gun's location in the car, stating that the gun was either in the car or the passenger's purse. *Id.* The caller also told the operator that the man and woman were possibly heading towards "Bill's" bar.[2] ECF No. 60-2 at 4.

Officer Johnson of the Baltimore County Police responded to the dispatch that there was a "subject with a weapon" at the 7-Eleven. ECF No. 55 at 2.[3] Approaching the 7-Eleven in his

---

[2] Throughout the 911 call, the caller insisted that the police pull over the Chrysler because of its expired license plate, and that the stop by the police must look like a traffic stop. ECF No. 60-2 at 1-4 (911 call transcript). The caller also stated that he did not know the occupants and had never seen them before, but did not explain how he knew there was a gun in the passenger's purse. *See id.*

[3] At the hearing, the government emphasized that Officer Johnson did not have all of the information provided to the 911 operator when he was responding to the call. The 911 operator was sending the information to a dispatcher, who relayed some information to Officer Johnson over the radio, while other information was being sent to Officer Johnson's computer. *See* ECF No. 69 at 139-60 (examination of Dawn Moorefield). Because the tape of Officer Johnson's discussion with the dispatcher was destroyed, at the hearing, Pollins moved for the Court to assume that all of the information in the 911 system was transferred to Officer Johnson. *Id.* at 57-58. However, such an inference is unnecessary because Officer Johnson's probable cause statement which was made directly after the incident states that Officer

marked police car, Officer Johnson saw a gold Chrysler with

North Carolina plates parked facing the convenience store.[4]  *Id.*

Officer Johnson pulled into the 7-Eleven and confirmed that the

Chrysler was occupied by an African American male driver and

Caucasian female passenger.[5]  ECF No. 69 at 22-23.  After Officer

---

Johnson was aware that the "call[er] stated there was a gold
Chrysler with unknown North Carolina tag, driven by a black male
and white passenger.  The caller stated they have a gun in the
vehicle.  Additional comments from the 911 caller advised he
thinks the black male has the gun but the white female
possib[ly] has the gun in her purse and that the subjects are at
7-[Eleven] on Holabird Ave possibly going to 'Bills' bar.  The
caller continued to advise Police Dispatch to have Officers stop
the vehicle for expired tags, then stated again there is a gun
in the car."  Def. Ex. No. 1.
        To the extent that Pollins was making a motion to dismiss
based on lost or destroyed evidence, the Court need not engage
in the analysis under *California v. Trombetta,* 467 U.S. 479, 485
(1984), because the Court will suppress the evidence and dismiss
the case on other grounds.

[4] At no time did Officer Johnson check the Chrysler's license
plate to determine if the tag had expired.  ECF No. 69 at 71-74.

[5] Officer Johnson testified at the hearing that he was "park[ed]
back a decent bit" from the Chrysler.  ECF No. 69 at 22.  The
probable cause statement asserts that Officer Johnson "parked
[his] vehicle directly off of the rear of the driver side" of
the Chrysler.  Def. Ex. No. 1 at 2.  Officer Johnson testified
at the hearing that by parking "directly off of the rear," he
was describing the angle of his vehicle and not distance.  ECF
No. 69 at 136-37.
        Pollins uses the probable cause statement to argue that the
*Terry* stop began the moment Officer Johnson parked his car.  *See*
ECF No. 70 at 5-6.  However, there is not enough evidence on the
record to conclude that Pollins and the passenger were detained
when Officer Johnson parked his car.  Officer Johnson testified
that the Chrysler could have left the parking lot freely, and
there is not enough evidence on the record to contradict him.

Johnson entered the 7-Eleven parking lot, "he observed that . .

. the occupants of the Chrysler immediately began twisting

around in their seats, looking anxiously over their shoulders at

him in his police cruiser."[6] *Id.* at 2-3. After seeing the

police car, the occupants "immediately began making furtive

movements, leaning forward, reaching toward the front floorboard

area, as if [to reach] under their seats." *Id.* at 3. "The

occupants were leaning so far forward that Officer Johnson could

no longer see their heads or shoulders as they ducked down,

reaching forward." *Id.* Officer Johnson believed that the

occupants were "either secreting something under the front seats

or reaching to retrieve something already secreted under the

front seat." *Id.*

Officer Johnson left his car and approached the Chrysler.

ECF No. 55 at 3. The occupants "continu[ed] to both lean

---

Therefore, the Court will assume that the *Terry* stop began when
Officer Johnson left his car.

[6] There was conflict at the hearing about when Officer Johnson
first saw the furtive movements, and how many times the
Chrysler's occupants turned to look at Officer Johnson.
Although there are minor discrepancies, the Court adopts the
facts in the probable cause statement. Significant time has
passed since this incident, and memories are imperfect. The
probable cause statement was prepared directly after the
incident, *see* ECF No. 69 at 61, and Pollins has shown no reason
to doubt its veracity; in fact, throughout the hearing, Pollins
relied on the probable cause statement as a true factual account
of the incident.

4

forward in their seats, and glance back at him." *Id.* As
Officer Johnson approached the Chrysler, the driver's side door
swung open. *Id.* Officer Johnson immediately ordered the
occupants to remain in the Chrysler, and to place their hands on
the dashboard. *Id.* The occupants complied. Officer Johnson
called for back-up. *Id.* When another officer arrived, the
occupants were removed from the Chrysler and seated apart from
each other on the sidewalk curb in front of the 7-Eleven. *Id.*
at 3-4; ECF No. 69 at 27-29. The passengers were not
handcuffed, but they could not touch the Chrysler from where
they were seated. ECF No. 69 at 28-29, 99-101. The man was
identified as the defendant, Quadell Pollins, and the passenger
was identified as Angelina Mikles. *Id.*

After several other officers arrived,[7] Officer Johnson
returned to the Chrysler to search for a weapon. ECF No. 55 at
4. Officer Johnson testified that he always searches cars in "a
clockwise motion"-starting with the front passenger side of the
car and moving around to end at the front of the driver's side
of the car. *See* ECF No. 69 at 29. When Officer Johnson reached
the passenger side floorboard of the Chrysler, he "located an

---

[7] Officer Johnson could not remember the exact number of police
cars that arrived, but testified that there were as many as six
additional officers. *See* ECF No. 69 at 99-101.

empty Newport brand cigarette box."[8]  ECF No. 55 at 4; *see also*
Def. Ex. No. 1 at 3 (probable cause statement also described the
cigarette box as "empty").

When Officer Johnson picked up the box, he "felt something
rattling around inside."[9]  ECF No. 69 at 29.  Officer Johnson
knew that whatever was rattling around was not a cigarette.  *Id.*
at 30.  "Upon opening the cigarette box, he located a glass tube
device, with black residue inside, which Officer Johnson
immediately recognized . . . to be drug paraphernalia, used for
smoking controlled dangerous substances."  *Id.*  The glass
smoking pipe contained a yellow plastic bag with a white powdery
substance that Officer Johnson believed was crack cocaine.  *Id.*
The tube and bag were very small, and very lightweight.  *See* ECF
No. 69 at 103-05.

---

[8] Officer Johnson testified that the box was not hidden under the
seat; it was located where the heels of a passenger's feet would
be located.  ECF No. 69 at 29.

[9] On cross examination, Officer Johnson testified that the
cigarette box could have contained a bullet that "could possibly
endanger [his] life."  ECF No. 69 at 101-03.  When questioned
further, Officer Johnson conceded that the presence of a bullet
would simply "indicate there might be other bullets."  *Id.* at
103.  Thus, "if [he] found a bullet inside a cigarette pack, [he
would continue [his] search of the vehicle," but the "existence
of [a] single bullet inside the cigarette pack" would not
endanger his life.  *Id.* at 102-3.

Officer Johnson left the Chrysler and asked the occupants to whom the items in the cigarette box belonged, but "neither occupant would claim ownership."[10]  ECF No. 55 at 4.  After, Mikles "became upset" and began yelling at Pollins.  *Id.* Pollins then stated that he'd "take the fall."  *Id.*

After this exchange, Officer Johnson returned to the Chrysler.  Upon discovering that the glove compartment was locked, Officer Johnson removed the car keys from the ignition and unlocked the glove compartment.  *Id.*  Inside the compartment was a .22 caliber handgun.  *Id.*

When questioned by the government about what he did after finding the "pipe and the small yellow baggy with residue," Officer Johnson stated,

> *From that point*, I knew that I had a full obligation to search the entire vehicle, and I then began to do such.  Starting with where I was still standing, *my initial stop* was to search the lunge, reach, and grab areas from where the occupants were. I knew from there I could search all lockable containers.

---

[10] During the hearing, Officer Johnson testified that he searched the glove box before questioning the occupants about the drug paraphernalia.  ECF No. 69 at 108-110.  Once again, the Court will credit the order of events in the probable cause statement which was created at the time of the incident.  In the probable cause statement, Officer Johnson stated that he left the Chrysler and questioned the occupants before searching the rest of the car.  *See* Def. Ex. No. 1 at 4.

ECF No. 69 at 31 (emphasis added).[11] On cross examination, Pollins attempted to clarify Officer Johnson's statement, and asked whether Officer Johnson searched the glove box because he "feared for [his] safety or because [he was] looking for contraband." *Id.* at 69. Officer Johnson responded that he opened the glove box because he had "previously found CDS," and, because he found the drugs, he "knew [he] could check all locked containers inside the vehicle." *Id.*

When Officer Johnson "ran a check" on the handgun from the glove compartment, he discovered that the handgun had been reported stolen. ECF No. 55 at 4. Pollins and Mikles were arrested and transported to the precinct. *Id.* At the precinct, Officer Johnson advised Pollins of his *Miranda* rights. ECF No. 55 at 4. Officer Johnson also gave Pollins a *Miranda* Rights Waiver Form, asking if Pollins could read. *Id.* Pollins confirmed that he could read, and Officer Johnson had Pollins read the form aloud. *Id.* Pollins initialed each of the five advisements on the form, and signed the waiver, indicating that he wished to waive his rights. ECF No. 55 at 5.

---

[11] After finding the firearm in the glove box, Officer Johnson continued his clockwise search, including the trunk of the Chrysler. ECF No. 69 at 33.

8

Pollins wrote a witness statement in which he explained that at 11:00 am that morning he had been at the Economy Inn Hotel to pick up Mikles and take her "somewhere safe." ECF No. 55-3 at 2. Mikles had been having arguments with her boyfriend, Mack Hershaw, who had been released from prison the previous week. *Id.* Pollins was concerned about Mikles's safety. *Id.* Pollins witnessed an argument between Mikles and Hershaw; Mikles told Hershaw that she was leaving him, and got into Pollins's car. *Id.* at 3.

Later in the day, Hershaw found Pollins and Mikles and began following the Chrysler in his car. ECF No. 55-3 at 3-4. When Pollins stopped at the 7-Eleven "to get cigarettes and a candy bar," Hershaw parked across the street and began screaming at them. *Id.* When Pollins returned to the Chrysler after making his purchases, he received a phone call from Hershaw telling them that they were "going to [] jail."[12] *Id.* Immediately after the call, Officer Johnson's car pulled into the 7-Eleven, and Pollins saw Hershaw's car speed off. *Id.*

---

[12] Then, Officer Johnson knew that Hershaw was the 911 caller. While the search was occurring at the 7-Eleven, Officer Johnson asked for the 911 call to be analyzed for the caller's identity. The call was made by Hershaw, but Hershaw did not answer his phone the multiple times that Officer Johnson called. *See* Def. Ex. No. 1 at 5.

Pollins asserted that Hershaw put the gun in the Chrysler. ECF No. 55-3 at 6.

At approximately 5:47 pm, Officer Johnson and Detective Crowl of the firearms interdiction unit began to interview Pollins about his statement.[13] ECF No. 55 at 5. Detective Crowl reminded Pollins of his *Miranda* rights, but Pollins stated that he wanted to speak to the officers. *Id.* at 6. Pollins told the officers everything he had put in his written statement. *Id.* Detective Crowl asked Pollins how Hershaw could have gotten the keys to the glove compartment to hide the gun, Pollins was quiet "for a short time." *Id.* Pollins then informed the officers that "his sister had given the gun to him a few days prior, in order to facilitate the sale of the gun to Hershaw; however, after a couple of days, Hershaw decided he did not want the gun anymore and gave it back to Pollins." *Id.* The officers had Pollins write an amendment at the bottom of his witness statement and initial the change. ECF No. 55-3 at 6.

B.   Procedural History

On September 25, 2014, a federal grand jury returned an indictment charging Pollins with unlawful possession of a firearm by a convicted felon, and seeking forfeiture of the firearm. ECF No. 1. On December 16, 2014, Pollins's original

[13] Officer Johnson and Detective Crowl had previously interviewed Mikles. ECF No. 55 at 5.

trial counsel filed motions to suppress evidence and statements.
ECF Nos. 15-16. The government never responded to these motions
because Pollins and the government entered into a plea
agreement, and rearraignment was scheduled for April 30, 2015.
*See* ECF No. 55 at 1.

Pollins, however, did not plead guilty; on February 27,
2015, his current trial counsel entered her appearance. ECF No.
29. On June 30, 2015, current counsel filed motions to suppress
evidence and statements identical to the prior motions. ECF
Nos. 42-43. On September 29, 2015, the government opposed the
motions. ECF No. 55.

On October 13, 2015, the Court held an evidentiary hearing
on Pollins's outstanding motions. ECF No. 62. At the end of
the hearing, the Court asked the parties if they wished to
submit additional briefing, but the parties declined. *See* ECF
No. 69 at 203-04. On October 14, 2015, Pollins filed a letter
in support of his motions to suppress asserting that "upon
further reflection on the testimony, we have determined this
short letter would be helpful to highlight for the Court a
potential additional legal ground for granting [the motions]."
ECF No. 63. On October 15, 2015, the government contacted
Chambers requesting time to order the hearing transcript and
respond to the letter. On October 16, 2015, the Court scheduled

further briefing. ECF No. 67. On October 21, 2015, the government responded to the letter. ECF No. 68. On October 26, 2015, Pollins replied. ECF No. 70.

II. Analysis

A. Pollins's Motion to Exclude Evidence

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures," U.S. Const. amend IV, a right necessary to the functioning of a free and open society, *see Florida v. Riley*, 488 U.S. 445, 457 (1989) (Brennan, J. dissenting). Thus, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few . . . exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnote omitted). Pollins argues that the search of the Chrysler violated the Fourth Amendment. ECF No. 43.

1. The Initial Stop of Pollins's Car

Under *Terry v. Ohio*, 392 U.S. 1, 30 (1968), a police officer may conduct a brief investigatory stop when the officer has reasonable suspicion to believe that criminal activity "may be afoot." Considering the totality of the circumstances, a court must "determine whether there was a sufficient objective, particularized basis for suspecting the person seized of

12

criminal activity." *United States v. Massenburg*, 654 F.3d 480, 485 (4th Cir. 2011).

"A *Terry* stop must be based on 'at least a minimal level of objective justification,' but the standard for reasonable suspicion is less demanding than for probable cause." *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004) (quoting *Illinois v. Wardlow,* 528 U.S. 119, 123 (2000)). Therefore, a police officer must have more than a "mere hunch" to justify a stop, but a court must "also credit the practical experience of officers who observe on a daily basis what transpires on the street." *Id.* (quotations and citation omitted).

When reasonable suspicion is based on an anonymous tip, the tip "must be accompanied by some corroborative elements that establish [its] reliability." *Perkins*, 363 F.3d at 323. This is because an "anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity inasmuch as ordinary citizens generally do not provide extensive recitations of the basis of their everyday observations and given that the veracity of persons supplying anonymous tips is 'by hypothesis largely unknown, and unknowable.'" *Alabama v. White*, 496 U.S. 325, 329 (1990) (quoting *Illinois v. Gates,* 462 U.S. 213, 237 (1983)).

Although an anonymous tip alone is seldom sufficient, courts have recognized that "there are situations in which an anonymous tip, suitably corroborated, exhibits sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop." *Florida v. J.L.*, 529 U.S. 266, 270 (2000) (citation omitted). "At bottom, the tip must 'be reliable in its assertion of illegality' to protect against mischief and harassment by an 'unknown, unaccountable informant.'" *United States v. Reaves*, 512 F.3d 123, 126 (4th Cir. 2008) (quoting *J.L.*, 529 U.S. at 271-72).

The Supreme Court has identified factors that make an anonymous tip sufficiently reliable to establish reasonable suspicion. In *Alabama v. White*, the police received an anonymous tip asserting that a woman carrying cocaine would be leaving an apartment at a particular time, traveling in a particular car, and driving to a specific location. 496 U.S. at 329. The Court determined that this evidence alone was insufficient to justify a *Terry* stop; however, upon receiving the tip, the police went to the apartment building and surveilled the woman as she completed the actions described in the anonymous tip. *Id.* at 332. The "independent police work" and the tipster's ability to predict the woman's future movements, "exhibited sufficient indicia of reliability to

14

justify the investigatory stop of respondent's car." *Id.* The
Court emphasized, however, that it was a "close" case because
"[k]nowledge about a person's future movements indicates some
familiarity with that person's affairs, but having such
knowledge does not necessarily imply that the informant knows,
in particular, whether that person is carrying hidden
contraband." *J.L.*, 529 U.S. at 271.

In contrast, in *Florida v. J.L.*, the Court considered an
anonymous tip stating that "a young black male standing at a
particular bus stop and wearing a plaid shirt was carrying a
gun." 529 U.S. at 268. The Court reasoned that the tip
"provided no predictive information and therefore left the
police without means to test the informant's knowledge or
credibility." *Id.* at 271. When police approached, J.L. "made
no threatening or otherwise unusual movements;" therefore, the
officers were forced to rely on the anonymous tip alone. *Id.* at
268, 271. The basic descriptive information of the tip was not
sufficient to justify a *Terry* stop. *Id.*

Relying on *White* and *J.L.*, the Fourth Circuit has ruled
that an anonymous tip was sufficient to establish reasonable
suspicion when the caller provided enough information for the
police officer to reasonably determine her identity, the police
officer was familiar with the criminal activity in that

15

neighborhood and the property described, the officer recognized one of the suspects as a drug dealer, and the caller was describing events contemporaneously. *Perkins*, 363 F.3d at 322. A caller's contemporaneous observation, however, is not in and of itself sufficient to establish reliability.

In *United States v. Reaves*, a woman called 911 stating that she had seen the driver of a car participate in what she believed was a drug transaction, and that the driver was carrying a gun. 512 F.3d at 125. The caller followed the suspect's vehicle and provided the police minute-by-minute commentary on where the car was located. *Id*. The Fourth Circuit held that the call was insufficient to justify a *Terry* stop because the caller did not predict the suspect's movements, and, other than her contemporaneous account, did not provide "sufficient corroboration to make the tip credible or reliable in its assertion of illegality." *Id*. at 128. Further, the police officer involved did not know the suspect, and the suspect "did not engage in any suspicious activity or commit any traffic violations in the short distance he was followed by the officer." *Id*.

In this case, the police received a 911 call describing the Chrysler's location, appearance, and occupants.[14] The Supreme Court stated in *Navarette v. California*, 134 S. Ct. 1683, 1689-90 (2014), that a "caller's use of the 911 emergency system" is an "indicator of veracity" because "[a] 911 call has some features that allow for identifying and tracing callers, and thus provide[s] some safeguards against false reports with immunity." However, the Court emphasized that a 911 call is not "*per se* reliable." *Id*. The anonymous tip in *Navarette*, contained information about the basis of the caller's knowledge--she was the victim of a reckless driving accident, and provided specific information about the other vehicle involved.[15] *Id*. As

---

[14] The caller also asserted that the occupants might be traveling to a particular bar, but, because Officer Johnson did not follow the Chrysler to the bar as was the case in *White*, there is no way to determine if the predictive information was accurate. Therefore, the court cannot consider the information about "Billy's" bar in assessing the reliability of the tip. *See White*, 496 U.S. at 329-32.

[15] The Court in Navarette contrasted the information about the caller's basis of knowledge as witness to a crime, with the phone call in *J.L.* in which there was no information about how the caller knew about the gun. 134 S. Ct. at 1688-90; *see also United States v. Beeson*, 611 F. App'x 773, 774-75 (4th Cir. 2015) (anonymous 911 call was sufficient to establish reasonable suspicion along with the officer's surveillance of a suspect's furtive movements when the caller said he witnessed people inside a closed business at night with flashlights); *United States v. Elston*, 479 F.3d 314, 317-18 (4th Cir. 2007) (911 call was sufficient to justify a *Terry* stop when the anonymous caller provided information that she was just with the suspect, he was

in *White*, the Court emphasized that it was a close case. *Id*. at 1692.

Here, unlike *Navarette*, the caller did not provide any information about the basis of his knowledge of the alleged criminal activity. He did not claim to be a witness to a crime. In fact, the caller was unsure about the exact location of the alleged firearm, stating that it could be in the car or the passenger's purse. Further, throughout the 911 call, the caller insisted that the police stop the Chrysler for expired tags, and that "it ha[d] to be [] like a traffic stop." ECF No. 60-2 at 3. Thus, although the fact that the caller used 911 provides the tip some reliability, this call is much more similar to the call in *J.L.*--the caller provided a detailed description of a subject in a particular place and claimed that the subject had a gun, but provided no information to verify the credibility of the tip.

As the Court stated in *J.L.*,

An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of

---

intoxicated, he threatened to hurt someone, and he had a gun in his car).

18

illegality, not just in its tendency to identify a
determinate person.

529 U.S. at 272. Put another way, if *Navarette* was a "close
case," and the tip in that case included several more indicia of
reliability than the anonymous call at issue here, then the call
in this case cannot on its own establish the reasonable
suspicion necessary for a *Terry* stop.

The government argues, however, that Officer Johnson did
not rely on the 911 call alone; he also observed Pollins's and
Mikles's "furtive behavior." ECF No. 55 at 10-11. "Evasive
conduct can, of course, assist an officer in forming reasonable
suspicion." *United States v. Sprinkle*, 106 F.3d 613, 618 (4th
Cir. 1997)

The Fourth Circuit has cautioned against "spin[ning] []
largely mundane acts into a web of deception" by labeling the
acts suspicious. *See United States v. Foster*, 634 F.3d 243, 248
(4th Cir. 2011). In *United States v. Sprinkle*, an officer
spotted a person that the officer knew to be involved in the
narcotics trade sitting in a car with another individual in a
high crime area. 106 F.3d at 618-19. The car's occupants were
"huddled with their hands close together," and when one occupant
recognized the officer, the occupant tried to hide his face.
*Id.* Although the court recognized that these actions were
suspicious, "without some stronger indication of criminal

activity, [they] cannot tip this case to reasonable suspicion."
*Id.*

Similarly, in *United States v. Foster*, a police officer was walking by an SUV and noticed that the driver appeared to be talking to himself. 634 F.3d at 245. Suddenly, the officer "witnessed a second black male sit up in the passenger seat from a crouching position." *Id.* The officer recognized the second individual as someone he had arrested in the past. *Id.* When the second individual saw the officer, he began "shifting" his arms and "going haywire." *Id.* The Fourth Circuit stated that the behavior was insufficient to establish reasonable suspicion because "there are an infinite number of reasonable explanations, unrelated to any criminal behavior, to explain why a passenger would not immediately be visible in a car. For example, he may have simply been bending over to retrieve a dropped item from the floor of the car."[16] *Id.* at 247.

The "furtive behavior" at issue here is very similar to the actions of the defendants in *Sprinkle* and *Foster*--Pollins and Mikles were leaning over, reaching under their seats, and

---

[16] In a recent opinion, *United States v. Slocumb*, 2015 WL 6388413, at *4-6 (4th Cir. Oct. 22, 2015), the Fourth Circuit stressed again that when furtive behavior provides "the only substantial basis for *particularized* suspicion," there must be a showing of behavior more "extreme" than mere "nervousness or acts of evasion."

appeared nervous when Officer Johnson neared. Based on the
prior cases, it is clear that these actions alone would be
insufficient to justify the subsequent *Terry* stop.

However, although the anonymous tip *alone* and the furtive
behavior *alone* would not be sufficient to establish reasonable
suspicion, *together* they do so. In *J.L.*, the Court noted that
the suspect did not make any "threatening or otherwise unusual
movements." 529 U.S. at 268, 271. In *United States v. Sims*,
296 F.3d 284, 286-87 (4th Cir. 2002), the Fourth Circuit used
this distinction to find that an anonymous tip combined with
furtive behavior was sufficient to establish reasonable
suspicion.[17]

In *Sims*, a police officer received a call that there was "a
black male wearing a T-shirt and blue jeans had just fired a
pistol in the area of 809 ½ South Oakwood Avenue." 296 F.3d at
285. When the officer looked around the reported area, he "saw
a black male behind 813 'in a crouched position,' 'peeking
around the corner . . . looking towards [him].'" *Id*. at 286.
When the officer made eye contact, the man "'jerk[ed] right

_____

[17] *See also United States v. Graham*, 483 F.3d 431, 439-40 (6th
Cir. 2007) ("In deciding whether the *Terry* frisk was lawful, we
must determine whether the anonymous tip and the furtive
movement observed by Halburnt, *when considered together*, support
a reasonable suspicion that Graham was armed and dangerous.")
(emphasis added).

21

back' behind the house, out of [the officer's] view." *Id*. This
furtive behavior, combined with the facts that the man matched
the description in the anonymous tip, established reasonable
suspicion for a *Terry* stop. *Id*. at 286-87 ("We conclude,
however, that Sims's furtive behavior distinguishes his case
from *J.L.*").

The facts here are similar to those in *Sims*. Officer
Johnson received an anonymous tip that was largely descriptive
and did not have the reliability necessary to justify a stop.[18]
When Officer Johnson investigated the tip, the suspects reacted
to his presence and appeared to be hiding something under their
seats while continually looking over their shoulders at him.
Therefore, Officer Johnson had reasonable suspicion to believe
that criminal activity was afoot and that there was a weapon in
the Chrysler.[19]

> 2. The Initial Search of the Vehicle and the Cigarette
> Box

Although the Court has determined that Officer Johnson had
reasonable suspicion to stop and search the Chrysler, the Court

---

[18] It should be notes that although the call in this case was
insufficient to establish reasonable suspicion, it was more
detailed than the call in *Sims*.

[19] Because the reasonable suspicion included a weapon, it also
provides the basis for a protective search of the vehicle rather
than the stop alone.

must next determine if Officer Johnson exceeded the scope of a *Terry* search. Because "[t]he purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence,"[20] a *Terry* search must be "strictly limited to that which is necessary for the discovery of weapons."[21] "An officer is not justified in conducting a general exploratory search for evidence under the guise of a stop-and-frisk." *United States v. Swann*, 149 F.3d 271, 274 (4th Cir. 1998). Therefore, "[i]f the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Dickerson*, 509 U.S. at 373.

As an initial matter, Officer Johnson removed Pollins and Mikles from the vehicle before he conducted the search. Pollins argues because he was "removed [from the Chrysler], detained, secured, [and] surrounded by up to six armed officers," the search was unlawful. *See, e.g.*, ECF No. 70 at 2.

In *Arizona v. Gant*, 556 U.S. 332. 335 (2009), the Supreme Court examined the search incident to arrest exception for vehicle searches, and determined that "does not authorize a

---

[20] *Adams v. Williams,* 407 U.S. 143, 145-146 (1972).

[21] *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (internal quotations omitted).

23

vehicle search incident to a recent occupant's arrest after the arrestee has been secured and cannot access the interior of the vehicle." The Court's reasoning in *Gant*, however, does not apply to *Terry* searches of vehicles. Because a *Terry* stop is temporary, and a subject may return to the vehicle at the end of a stop (unlike an arrest), then the police officer's safety is threatened by a possible weapon even if the individual is detained at the time of the stop. *See United States v. Holmes*, 376 F.3d 270, 279-81 (4th Cir. 2004); *United States v. Navarrete-Barron*, 192 F.3d 786, 791-92 (8th Cir. 1999). Therefore, it is irrelevant that Pollins and Mikles were removed from the Chrysler before Officer Johnson searched for weapons.[22]

When Officer Johnson looked at the passenger side floorboard of the Chrysler, he "located an empty Newport brand cigarette box."[23] It is undisputed that a *Terry* stop includes the entire passenger compartment of a vehicle, including any "containers." *Holmes*, 376 F.3d at 280-81. However, searching

---

[22] After the hearing, Pollins altered his argument somewhat. Previously, he had argued that because he was nowhere near the car, the search was unlawful. After the hearing, Pollins argued that because Officer Johnson "had already mentally decided to arrest the suspects" after opening the cigarette box, the search of the glove box should be analyzed as a search incident to arrest. ECF No. 70 at 3. The Court need not determine when the *Terry* stop ended and when the arrest began in order to analyze the search as a search incident to arrest because the evidence must be suppressed under *Terry*. *See infra*.

[23] ECF No. 55 at 4.

24

containers is limited to those that may contain weapons or whose illegality is immediately apparent. *See Dickerson*, 508 U.S. at 274-78. An officer's decision to search a container is evaluated under an objective standard of reasonableness. *See Swann*, 149 F.3d at 275-77.

Based on these limitations, it is apparent that Officer Johnson exceeded the scope of the *Terry* search by opening the cigarette container. Officer Johnson opened the cigarette box not because he believed that it contained a weapon that was a danger to him, but because he believed it contained some sort of contraband.

The government attempts to justify the search of the cigarette container by asserting that "based on his training, knowledge and experience, Officer Johnson knew some handguns are quite small and could potentially be hidden in a cigarette box." ECF No. 55 at 16. The government also attached a picture of such a handgun that fits tightly inside a cigarette box.[24] ECF No. 55-4.

---

[24] At the hearing, the government presented evidence that Officer Johnson is currently earning a gunsmithing degree in which he has come across small firearms, and that he had seen photos of small guns while at the police academy. ECF No. 69 at 11-15. However, Officer Johnson's current gunsmithing endeavors are irrelevant to what he knew two years ago at the time of the *Terry* stop, and, other than seeing photographs at the academy, Officer Johnson never came across cigarette box sized firearms in his duties.

However, Officer Johnson's probable cause statement and the government's factual summary state that the cigarette box in this case appeared empty. At the very least, when Officer Johnson picked up the box it was apparent that it could not contain a tightly packed handgun, especially as the glass tube and small bag in the cigarette box were very lightweight.[25] If the Court were to hold that it was objectively reasonable for any officer to believe that there was a miniature handgun in any container as small as a cigarette box, then the exception would consume the rule, making *Terry*'s container limitations largely irrelevant.[26]

When Officer Johnson opened the cigarette box, it was objectively unreasonable to conclude that it contained a handgun. In fact, Officer Johnson stated that he opened the cigarette box because he heard something "rattling around" inside and knew it was not a cigarette. Therefore, Officer Johnson was engaging in the "sort of evidentiary search that

---

[25] Officer Johnson's testimony concedes that, at most, he believed there might be a bullet rattling around in the cigarette box.

[26] That is not to say that any search of a cigarette box in a car would violate *Terry*. There could be a case in which, under the totality of the circumstances, a police officer could reasonably believe that a cigarette box contained a pocket knife or other weapon, including a small firearm. Those facts are simply not present here.

*Terry* expressly refused to authorize."[27] *Dickerson*, 508 U.S. at 378; *see also United States v. Allison*, 637 F. Supp. 2d 657, 666 (S.D. Iowa 2009) ("The law enforcement officers did not testify that the gym bag was itself of such 'incriminating character to be immediately apparent' that it contained contraband. Consequently, the bag presented no concerns for officer safety that would justify a *Terry* search of the bag's contents.") (citation omitted).

Because opening the cigarette box exceeded the scope of a *Terry* search, the evidence from inside the box must be suppressed.

### 3. The Search of the Glove Compartment

When evidence is obtained in violation of the Fourth Amendment, the government will generally be barred from using the evidence from the illegal search under the exclusionary rule. *See United States v. Calandra*, 414 U.S. 338, 347 (1974). In ruling on a motion to suppress and applying the exclusionary rule, the "burden of proof is on the party who seeks to suppress

---

[27] It is likely that Officer Johnson believed that the cigarette box contained some evidence of illegal activity based upon its location in the car and the occupants' movements apparently trying to secret something beneath the seats. However, this belief is not sufficient to justify a search of the box. The automobile exception to the warrant requirement only applies if the officer has "probable cause to believe that the vehicle contains contraband or evidence of illegal activity." *United States v. Scott*, 428 F. Supp. 2d 1126, 1133-34 (E.D. Cal. 2006).

the evidence." *United States v. Bello-Murillo*, 62 F. Supp. 3d 488, 491-92 (E.D. Va. 2014). "Once the defendant establishes a basis for his motion to suppress, the burden shifts to the government to prove the admissibility of the challenged evidence by a preponderance of the evidence." *Id.*

Here, Pollins has carried his burden to establish a basis for his motion; as previously discussed, the evidence from the cigarette box was unlawfully obtained. Therefore, whether the evidence from the glove compartment must also be suppressed is dependent on its relationship to the search of the cigarette box.

The exclusionary rule applies to derivative evidence of an unlawful search. Derivative evidence is evidence that "has been come at *by exploitation* of [an] illegality . . . instead [of] means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (emphasis added and internal quotation marks omitted). "[A] direct, unbroken chain of causation is necessary, but not sufficient to render derivative evidence inadmissible." *United States v. Najjar*, 300 f.3D 466, 477 (4th Cir. 2002).

In *Nix v. Williams*, 467 U.S. 431, 444 (1984), the Supreme Court adopted the inevitable discovery doctrine, under which evidence unlawfully obtained may be admitted if the government

28

"establish[es] by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." "[T]he premise of the inevitable discovery doctrine is that the illegal search played no real part in discovery of incriminating evidence. Only then, if it can be shown that the taint did not extend to the second search, would the product of the second search be admissible." *United States v. Whitehorn*, 813 F.2d 646, 650 n. 4 (4th Cir. 1987), *cert. denied*, 487 U.S. 1234 (1988); *accord United States v. Thomas*, 955 F.2d 207, 209 (4th Cir. 1992). "[T]he doctrine requires the fact or likelihood that makes discovery inevitable arise from circumstances other than those disclosed by the illegal search itself." *Thomas*, 955 F.2d at 210. "The inevitable discovery exception to the exclusionary rule is grounded in reasonableness. It merely reflects the underlying purpose of the exclusionary rule: the deterrence of illegal police conduct in the search for evidence." *United States v. Rodriquez*, 750 F. Supp. 1272, 1274-78 (W.D.N.C. 1990).

For example, in *United States v. David*, 943 F. Supp. 1403, 1418-20 (E.D. Va. 1996), the district court found that even if a search of the defendant's mail was illegal, it did not taint subsequent searches because "the investigation for the firearm violations had begun before the alleged illegal search and

simply continued in the same manner that the officers would have proceeded had that search not occurred." *Compare with Thomas*, 955 F.2d at 207-10 (officers who were originally investigating drug trafficking altered their investigation to include bank robbery after an illegal search of a hotel room). Similarly, in *United States v. Rodriquez*, a police officer conducted an unlawful *Terry* frisk of a defendant's person. 750 F. Supp. at 1274-78. The district court ruled, however, that the evidence was admissible under the inevitable discovery doctrine, because the officers had reasonable suspicion to search the vehicle, intended to search the vehicle, would have found a handgun, arrested the defendant, and conducted a search incident to arrest. *Id.* What was important was that the police always intended to search the car, but merely conducted the illegal *Terry* frisk first. *Compare id. with United States v. Morris*, 684 F. Supp. 412, 415-16 (D. Md. 1988) (government could not rely on the inevitable discovery doctrine if their intent to search the vehicle did not arise before the illegal search). Therefore, the determinative question in this case is, "Why did Officer Johnson search the glove compartment?"[28]

---

[28] It is undisputed that a *Terry* search for weapons can include a locked glove box. *See United States v. Holifield*, 956 F.2d 665, 669-70 (officer unlocked a locked glove compartment by taking keys from the ignition). However, the relevant question here is

30

The government argues that Officer Johnson's search of the

glove compartment was merely a continuation of his *Terry* search,

and, at most, finding the evidence inside the cigarette box

merely gave Officer Johnson a *second* reason to search the car.[29]

*See* ECF No. 68 at 2-3.  However, this argument ignores the

evidence provided at the evidentiary hearing.  Officer Johnson's

testimony at the evidentiary hearing clearly established that he

began a second search after opening the cigarette box, he

searched the glove compartment *because* of the evidence he found

in the cigarette box, and he did not intend to search the glove

---

whether the search of the glove compartment was part of the
*Terry* search or whether it was a search for contraband.

[29] The government argues that if the Court were to suppress the
evidence from the search of the glove compartment, it "would
lead to the illogical conclusion that a police officer,
possessing a lawful basis to conduct a search, would lose the
ability to rely on that basis, if he developed different or
additional information that caused him, in his own mind, to have
a separate and additional legal theory upon which to justify
conducting a search (even if the original facts and
circumstances did not change)."  ECF No. 68 at 2.   The
government's slippery-slope argument is not persuasive.   The
Court is not holding that the fruits of a subsequent search of a
glove compartment after exceeding the bounds of *Terry* in
searching a container is *per se* derivative evidence.   If the
evidence establishes that the officer always intended to search
the glove compartment regardless of the unlawful search, then
the glove compartment evidence would not be derivative.   The
Court is merely finding that the government has not carried its
burden to show an independent source based on these specific
facts, including evidence that Officer Johnson would not have
searched the glove compartment but for the illegally obtained
evidence.

compartment otherwise.[30]  Officer Johnson stated that his

"initial stop" was to search the "lunge, reach, and grab areas"

of the Chrysler, and that only after finding the cigarette box

did he decide to search the locked compartments of the car.

The fact that Officer Johnson started a second search upon

finding the drug evidence, rather than simply continuing his

*Terry* search, is further supported by Officer Johnson's

description of how he conducted the search.  Officer Johnson

testified that he searches all vehicles in a "clockwise motion,"

starting with the front most area of the passenger side.  Here,

the glove compartment was counterclockwise to the cigarette box,

showing that Officer Johnson reversed his search pattern after

finding the drug evidence.

Moreover, Officer Johnson testified that after finding the

drug evidence, he searched the trunk of the Chrysler.  A *Terry*

search for weapons only includes the passenger compartment of

the vehicle and does not include the trunk.  *See Long,* 463 U.S.

---

[30] The parties dedicate the majority of their post-hearing briefs
to discussing whether reasonable suspicion for a *Terry* search is
analyzed merely from an objective standpoint, or whether it
takes into account an officer's subjective belief.  These
arguments, however, miss the central point.  The issue here is
not whether an officer's subjective belief can negate reasonable
suspicion for a *Terry* stop.  The issue is whether, once an
illegal search has been established, an officer's subjective
purpose in searching another location informs the independent
source analysis.  The case law discussed previously clearly
establishes that the officer's subjective purpose should be
considered.

at 1049; *Valance v. Wisel,* 110 F.3d 1269, 1278 (7th Cir. 1997)
("The trunk search cannot be justified under *Michigan v. Long*
because Valance would not have been able to gain immediate
control of a weapon located there."). Thus, the fact that
Officer Johnson searched the trunk of the Chrysler after finding
the drug evidence in the cigarette box shows that he was
engaging in a search under the automobile exception to the
warrant requirement and was no longer engaging in a *Terry* search
for weapons.[31]

Because the evidence establishes that the search of the
glove compartment derived from the illegal cigarette box search,
the firearm recovered must be suppressed. Further, by
suppressing the drug evidence and the firearm, the Court must
also suppress Pollins's statements under the exclusionary rule
of the Fourth Amendment because the statements were made either
in direct reference to the drugs discovered illegally or through
an arrest that was solely based on an illegal search.[32]

---

[31] As previously stated, the automobile exception to the warrant
requirement applies if the officer has "probable cause to
believe that the vehicle contains contraband or evidence of
illegal activity." *Scott*, 428 F. Supp. 2d at 1133-34. The
automobile exception cannot provide a valid basis for the search
in this case because it would still be dependent on the
illegally obtained evidence from the cigarette box and would
remain derivative evidence.

[32] Because the Court is suppressing all of Pollins's statements
under the Fourth Amendment, Pollins's motion to suppress

III. Conclusion

For the reasons stated above, the Court will grant Pollins's motion to suppress evidence and will deny Pollins's motion to suppress statements as moot.

11/9/15
Date

William D. Quarles, Jr.
United States District Judge

statements under the Fifth and Sixth Amendments will be denied as moot.